UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| KIMBERLY NELSON, | CASE NO. 1:23-CV-1911-PAG |
| Plaintiff, | JUDGE PATRICIA A. GAUGHAN |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

### INTRODUCTION

Plaintiff Kimberly Nelson challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On October 2, 2023, pursuant to Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry dated Oct. 2, 2023). Following review, and for the reasons stated below, I recommend the District Court **AFFIRM** the Commissioner's decision.

### PROCEDURAL BACKGROUND

Ms. Nelson applied for DIB in March 2011 and again in January 2014, receiving an unfavorable decision both times. (Tr. 187). On August 16, 2019, she filed a third application for DIB (Tr. 398-404) and applied for SSI on August 19, 2019, alleging a disability-onset date of June 17, 2017. (Tr. 405-12). The 2019 claims were denied initially and on reconsideration. (Tr. 259,

1

262, 268, 273). Ms. Nelson then requested a hearing before an Administrative Law Judge. (Tr.

276-77). On November 20, 2020, the ALJ held an administrative hearing where Ms. Nelson

(represented by counsel) and a vocational expert (VE) testified. (Tr. 151-84). On February 25,

2021, the ALJ determined Ms. Nelson was not disabled. (Tr. 229-50).

On March 2, 2022, the Appeals Council vacated the ALJ's decision and remanded the

case. (Tr. 251-58). The same ALJ held a new administrative hearing on July 13, 2022, where Ms.

Nelson (represented by new counsel) and a VE testified. (Tr. 110-45). On August 17, 2022, the

ALJ again determined Ms. Nelson was not disabled. (Tr. 76-105). The Appeals Council denied Ms.

Nelson's request for review on August 8, 2023, making the second hearing decision the final

decision of the Commissioner. (Tr. 1; *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455 and

416.1481). Ms. Nelson timely filed this action on September 30, 2023. (ECF #1).

## FACTUAL BACKGROUND

### I.    Personal and vocational evidence

Ms. Nelson was 44 years old on the alleged disability-onset date and 49 years old at the

2022 administrative hearing. (Tr. 398, 405). She has a high school diploma. (Tr. 125). Her past

work history includes employment as a warehouse worker from April 1998 until October 2005

and as a state-tested nurse aide from 2007 to 2011 and 2014 to 2017 at various facilities. (Tr. 453).

She has not worked since November 2020. (Tr. 125).

### II.   Relevant medical evidence

Ms. Nelson suffers from lumbosacral intervertebral disc degeneration, type II diabetes,

hypertensive heart disease, asthma, obesity, nicotine dependence, and major depressive disorder.

(Tr. 571, 577).

In the months leading up to the alleged disability-onset date of June 17, 2017, Ms. Nelson visited Harigopal Balaji, M.D., for examinations. On January 27, 2017, Dr. Balaji assessed Ms. Nelson with type II diabetes, hypertensive heart disease, asthma, chronic obstructive pulmonary disease (COPD), obesity, nicotine dependence, and major depressive disorder. (Tr. 571). Dr. Balaji stopped her previous pain-reliever prescription and continued medications for her diabetes, hypertension, asthma, and depression. (Tr. 571-72). At a follow-up examination on March 23, 2017, Ms. Nelson reported migraine headaches and was prescribed medication. (Tr. 575). On a follow-up examination on June 8, 2017, Dr. Balaji assessed Ms. Nelson with intervertebral disc degeneration[1] in the lumbosacral region (essentially, the lower half) of her back. (Tr. 577). She returned a week later to Dr. Balaji coughing, wheezing, and unable to lie flat due to shortness of breath. (Tr. 579). Dr. Balaji diagnosed her with acute bronchitis and an acute asthma exacerbation and prescribed an antibiotic. (Tr. 580).

Ms. Nelson's follow-up examination four days later was normal. (Tr. 583). She was continued on antibiotics, prescribed steroids, and was referred to University Hospital. (Tr. 584). Ms. Nelson was admitted to the hospital on June 19, 2017 so her chest could be X-rayed and her bloodwork taken. (Tr. 1260). There, Ms. Nelson was given breathing treatment and intravenous steroids. (Tr. 1265). Ms. Nelson was discharged on June 21 in stable condition. (*Id.*). She denied any pain at that time. (Tr. 1268). A follow-up examination with Dr. Balaji on June 28 revealed a generally normal condition without wheezing. (Tr. 586). At subsequent follow-up examinations,

---

[1]     Intervertebral disc disease is a condition characterized by the breakdown (degeneration) of one or more of the discs that separate and cushion the bones of the spine (vertebrae), causing pain in the back or neck and frequently in the legs and arms. *Intervertebral Disc Disease*, *MedlinePlus*, https://medlineplus.gov/genetics/condition/intervertebral-disc-disease/ (last accessed July 23, 2024).

Ms. Nelson generally presented well with stable conditions until May 2018, aside from a small ulcer in her foot from a pedicure that responded well to treatment. (Tr. 589, 592, 595, 598, 601, 604, 606-07, 609-10).

On May 12, 2018, Ms. Nelson was involved a motor vehicle accident and sought treatment in the emergency room. (*See* Tr. 612). She saw Dr. Balaji on May 23 having experienced pain in her lower back and neck since the accident. (*Id.*). Dr. Balaji assessed her with lower back pain, cervicalgia, and headaches from the accident. (Tr. 613-14). On October 8, Ms. Nelson presented to the emergency room with Dr. Balaji complaining of pain in her right shoulder and elbow after falling on her shoulder after her dog tripped her the previous night. (Tr. 1093). X-ray imaging of her shoulder and elbow were "unremarkable." (Tr. 1099). Ms. Nelson was diagnosed with a contusion and a shoulder sprain and discharged. (Tr. 1103-04). Dr. Balaji prescribed her pain relievers. (Tr. 622-23). In several subsequent examinations with Dr. Balaji over the first half of 2019, Ms. Nelson presented well and did not complain of pain. (Tr. 627-28, 631-33, 634-36, 638-40).

On August 1, 2019, Ms. Nelson presented to Dr. Balaji with severe pain in her lower back and left hand. (Tr. 642). Dr. Balaji repeated his 2017 diagnosis of intervertebral disc degeneration in her lumbosacral region; he ordered an MRI and referred Ms. Nelson to a rheumatologist. (Tr. 643-44; *compare* Tr 643-44 *with* Tr. 577). The MRI was taken August 15 and revealed:

> At L-3-L4 mild disc dehydration noted with minimal bulge, minimal facet joint arthropathy without any spinal canal or neural foramina stenosis.
>
> At L4-L5 mild facet joint arthropathy and ligamentum flavum hypertrophy indenting the posterolateral aspect of the thecal sac without any spinal canal or neural foramina stenosis.
>
> At L5-S1 there is broad-based degenerated disc bulge noted, indenting the anterior thecal sac. Mild facet joint arthropathy, ligamentum flavum hypertrophy noted

causing mild left lateral recess and left neural foramina narrowing and mild encroachment of the right neural foramina.

IMPRESSION:
At L5-S1 there is broad based degenerated disc bulge with mild endplate changes noted, moderate edema in the L5 and S1 vertebral bodies noted. Degenerated disc bulge and mild facet joint arthropathy in combination noted causing mild left lateral recess and left neural foramina narrowing and mild encroachment of the right neural foramina.

There is linear hypointense signal on T1 and T2 weighted images noted in the bodies of the L5 and S1 vertebral bodies with significant surrounding edema, subtle fractures cannot be excluded as clinically indicated a follow-up CT scan or MRI recommended.

(Tr. 786; *see also* Tr. 645). Dr. Balaji noted Ms. Nelson has had lumbar blocks[2] without relief and he referred her to a neurosurgeon. (Tr. 647). Dr. Balaji also prescribed Ms. Nelson a handicapped-parking placard. (Tr. 645).

On October 14, 2019, Ms. Nelson was examined by Elizabeth Roter, M.D., a rheumatologist, on Dr. Balaji's referral. (Tr. 651). Ms. Nelson complained of "horrible" pain "everywhere" and up her arms, legs, and hands. (*Id.*). Ms. Nelson stated her pain caused her to quit her job because she could no longer safely lift patients. (*Id.*). Dr. Roter's examination revealed 18 fibromyalgia tender points, diffuse hand tenderness, bilateral knee crepitus, give-away weakness, and a depressed affect, but no evidence of rheumatoid arthritis or any other kind of inflammatory arthritis. (*See* Tr. 652). Dr. Roter diagnosed Ms. Nelson with fibromyalgia and chronic back pain. (*Id.*). Dr. Roter referred her to a pain-management clinic and a sleep study. (Tr. 653).

---

[2]     A lumbar block is a procedure where a numbing medication and sometimes an anti-inflammatory medication are injected into the lower back to provide pain relief. *See Lumbar Sympathetic Blocks*, *Cleveland Clinic*, https://my.clevelandclinic.org/health/treatments/17187-lumbar-sympathetic-block (last accessed July 23, 2024).

On June 24, 2020, Ms. Nelson began care with Mark Roth, M.D. (Tr. 1486). On July 27,

Dr. Roth diagnosed her with back, ankle, and shoulder pain. (Tr. 1481). He ordered X-ray imaging

of her ankle and shoulder, suspecting she had torn her right rotator cuff; he also referred her to an

orthopedist. (*Id*.). On July 27, an X-ray of Ms. Nelson's left ankle showed signs consistent with

osteochondritis dissecans.[3] (Tr. 1945). The X-ray did not show any loose body or fractures but did

show degenerative changes in her ankle. (Tr. 1945-46). An MRI would be needed to further

evaluate her condition. (Tr. 1946).

On August 3, 2020, on referral from Dr. Roth, Ms. Nelson consulted with Randall

Marcus, M.D., an orthopedic surgeon, regarding her ankle pain. (Tr. 1466). Ms. Nelson

complained her left ankle was unstable and would give way. (*Id*.). Dr. Marcus examined her and

suspected she had osteochondrosis dissecans around the medial talar dome in her ankle.[4]

(Tr. 1469). He ordered an MRI of her ankle. (*Id*.). On August 28, an MRI of Ms. Nelson's left

ankle confirmed, among other things, the suspected diagnosis. (Tr. 1476). On August 31, Dr.

Marcus concluded the condition was causing her chronic ankle pain and instability. (Tr. 1460). He

recommended an outpatient surgical procedure to correct the problem. (*Id*.). Dr. Marcus estimated

---

[3]     Osteochondritis dissecans is a joint condition in which bone underneath the cartilage of a joint dies due to lack of blood flow. This bone and cartilage can then break loose, causing pain and possibly hindering joint motion. *Osteochondritis Dissecans*, *Mayo Clinic*, https://www.mayoclinic.org/diseases-conditions/osteochondritis-dissecans/symptoms-causes/syc-20375887 (last accessed July 23, 2024).

[4]     An osteochondritis dissecans of the talus (also called a talar osteochondral lesion or osteochondral lesion of the talus) is an area of abnormal, damaged cartilage and bone on the top of the lower bone of the ankle joint (the talus bone). *See Osteochondral Lesion of the Talus, Foot & Ankle Center at Massachusetts General Hospital*, https://www.massgeneral.org/orthopaedics/foot-ankle/conditions-and-treatments/ocd-osteochondral-defect (last accessed July 23, 2024).

Ms. Nelson would need to be in a cast for approximately a month following the surgery and avoid putting weight on her ankle for 10 weeks. (*Id.*).

On February 12, 2021, on referral from Dr. Roth, Ms. Nelson consulted with Michael Karns, M.D., an orthopedist, about her chronic shoulder pain. (Tr. 1491). She reported that since she fell on her shoulder in 2020, she experienced chronic pain and weakness in her right shoulder and had trouble elevating her arm over her head. (*Id.*). Dr. Karns ordered X-rays of her right shoulder and concluded there was no significant fracture or dislocation. (Tr. 1501). He ordered an MRI of her right shoulder to evaluate for labral, rotator cuff, and other soft-tissue injuries. (*Id.*). On March 11, an MRI of her right shoulder revealed, among other things, a complete tear of the supraspinatus tendon, a part of the rotator cuff. (Tr. 1505). The next day, Dr. Karns recommended surgical repair to her shoulder. (Tr. 1507).

On March 24, 2021, the surgery was performed and Ms. Nelson was discharged home with a sling. (Tr. 1515-20). At a March 30 post-operative examination, she reported chest and shoulder pains and was prescribed pain relievers and physical therapy. (Tr. 1524-26). At the one-month post-operative examination on April 27, Ms. Nelson reported she "turned the corner" and was feeling no pain. (Tr. 1542). She also presented well at her three- and six-month post-operative examinations, though she was hospitalized in July for several days with sepsis and a urinary tract infection. (Tr. 1538-39, 1534-35; 1772, 1782, 1884).

During a November 11, 2021, visit with Haitham Kousa, M.D., Ms. Nelson was tearful from severe lower abdominal pain that had lasted four days. (Tr. 1988). Dr. Kousa sent her to the emergency room. (Tr. 1989). Ms. Nelson returned to Dr. Kousa on December 20 complaining of low-back pain that she rated as an eight to ten out of ten without medication and four out of ten

with medication. (Tr. 2010). Dr. Kousa prescribed pain relievers. (Tr. 2011). Ms. Nelson consulted with Dr. Kousa regularly between December 2021 and May 2022. (Tr. 2007, 2004, 2001, 1997, 1994, 1993). Dr. Kousa noted that by March 1, 2022, her shoulder was not back to normal after her surgery, she could not lift more than five to ten pounds, and she had a very limited range of motion. (Tr. 2001).

At that March 1 visit, Ms. Nelson also complained to Dr. Kousa of memory problems. (*See* Tr. 2000). Dr. Kousa referred her to Patrick Tessman, M.D., a neurologist, to evaluate her memory loss and rule out dementia. (Tr. 2000). She was examined by Dr. Tessman on March 25 and she reported forgetting things over the last year, such as why she was going to the store or to take food out of the oven. (Tr. 1929). Dr. Tessman performed a neurological exam and a miniature mental-status exam that revealed memory loss. (Tr. 1929-30). On April 6, Ms. Nelson's electroencephalogram was normal, (Tr. 1934), but a cognitive test showed impairment with every domain tested and was consistent with moderate dementia. (Tr. 1926). A subsequent examination revealed a mild radiculopathy. (Tr. 1936). On April 27, Dr. Tesssman prescribed a Vitamin B12 supplement and referred her to a psychiatrist for evaluation and treatment. (Tr. 1967-68).

## III.    Relevant medical opinions

On October 18, 2019, in connection with the initial state agency determination on Ms. Nelson's disability applications, state agency medical consultant Indira Jasti, M.D., opined on Ms. Nelson's residual functional capacity (RFC). (Tr. 194-98, 208-212). Dr. Jasti opined that Ms. Nelson could occasionally lift and carry 20 pounds and 10 pounds frequently; stand or walk for about 6 hours during an 8-hour workday and sit for about 6 hours; never climb ladders, ropes, or scaffolds; occasionally stoop; frequently balance, kneel, crouch, crawl, and climb ramps and stairs.

(Tr. 195, 209). Dr. Jasti opined Ms. Nelson needed to avoid concentrated exposure to extreme cold, heat, and humidity and avoid exposure to pulmonary irritants and hazards. (Tr. 196, 210).

On October 28, 2020, Ms. Nelson's treating physician, Mark Roth, M.D., completed a medical opinion form in connection with her disability application. (Tr. 1458). Dr. Roth opined that, starting in 2017, Ms. Nelson suffered from back pain caused by lumbar disc disease and pain in her left ankle caused by osteochondritis dissecans. (*Id.*). Dr. Roth opined that Ms. Nelson could not perform a full-time job for 8 hours a day, 5 days a week. (*Id.*) He further opined she could stand and walk for less than 2 hours and sit for less than 2 hours during an 8-hour workday, could lift and carry less than 10 pounds, would need the freedom to shift positions at will, would need to lie down at unpredictable times, and would be absent from work 4 or more times per month. (*Id.*).

On November 12, 2020, Ms. Nelson's treating orthopedic surgeon, Randall Marcus, M.D., completed a similar form in connection with her disability application. (Tr. 1459). Dr. Marcus diagnosed Ms. Nelson with osteochondritis dissecans lesion in her left talus and that condition was causing her left ankle pain. (*Id.*). He opined Ms. Nelson could perform a full-time job for 8 hours a day, 5 days a week. (*Id.*). He further opined she could stand and walk for 3 hours, had no limitations on sitting, could lift and carry 10 pounds occasionally and less than 10 pounds frequently, and needed the ability to shift positions at will. (*Id.*). Dr. Marcus did not express an opinion on whether Ms. Nelson's limitations would cause her to be regularly absent from work but he stated she would need time off from work to recover after her scheduled ankle surgery. (*Id.*).

On January 21, 2022, another of Ms. Nelson's primary-care physicians, Joseph Kousa, M.D., wrote a letter in connection with her disability application. (Tr. 1553). Dr. Kousa opined, "Ms. Nelson suffers from multiple medical problems that render her ability to keep a gainful

9

employment position nil. As such I believe she is not employable and should be granted benefits on that basis." (*Id.*). Dr. Kousa cited as relevant medical conditions Ms. Nelson's "herniated disc lumbar spine (abnormal MRI)," "left ankle osteoarthritis (abnormal MRI)," and "right shoulder rotator cuff tear, status post-surgery." (*Id.*).

## IV.    Relevant testimonial evidence

On July 13, 2022, Ms. Nelson participated in a remote hearing via teleconference before the ALJ. (Tr. 112). She testified experiencing lower back pain all day, every day. (Tr. 126). She rated her pain as an eight out of ten without medication and a seven out of ten with medication. (*Id.*). Her pain has worsened with time, making it impossible for her to comfortably sit or stand for more than a minute, take more than a few steps, or lift more than an empty plastic bag. (Tr. 127, 130). She cannot stand long enough to do household chores like cooking, cleaning, or laundry, so her son or a friend who lives with her must do all the housework. (Tr. 129). She reported her medical treatments have not helped with her pain. (Tr. 121). While surgery in her right shoulder has somewhat helped relieve her pain, she reported still experiencing sharp pains in her shoulder when reaching that cause her to drop things. (Tr. 131). At the administrative hearing, she reported it was too soon to tell whether her recent ankle surgery would bring lasting pain relief because her foot was still in a cast. (Tr. 132).

After Ms. Nelson's testimony, the VE testified. The ALJ posed to the VE a hypothetical individual with Ms. Nelson's age, education, and prior work history and the following limitations: (i) is limited to the sedentary exertion level; (ii) can occasionally climb ramps and stairs; (iii) can never climb ladders, ropes, or scaffolds; (iv) can occasionally balance, stoop, kneel, crouch, crawl; (v) can never be exposed to unprotected heights and moving mechanical parts; (vi) cannot operate a motor vehicle; (vii) can frequently be exposed to extreme cold and heat, humidity, dust, odors,

fumes, and pulmonary irritants; (viii) can understand, remember and apply information; (ix) can concentrate, persist, and maintain pace to perform simple routine and repetitive tasks, but not at a production-rate or assembly-line pace; (x) is limited to simple work-related decisions, using her judgment, and dealing with changes in the work setting; and (xi) is able to frequently interact with supervisors, coworkers, and the public. (Tr. 139-40). The VE concluded that such a person could not perform Ms. Nelson's previous jobs. (Tr. 140). But, in the VE's opinion, such a person could perform work in the national economy as a sorter, inspector, and assembler. (Tr. 140-41).

The ALJ posed to the VE a new hypothetical individual with Ms. Nelson's age, education, and prior work history and the following limitations: (i) is limited to the sedentary exertion level; (ii) can occasionally operate left-foot controls and frequently operate right-hand controls; (iii) can occasionally reach overhead and frequently reach in all other directions, handle, and finger with the right and left arms; (iv) can occasionally climb ramps and stairs; (v) can never climb ladders, ropes, or scaffolds; (vi) can occasionally balance, stoop, kneel, crouch, crawl can never be exposed to unprotected heights and moving mechanical parts; (vi) cannot operate a motor vehicle; (vii) can frequently be exposed to extreme cold and heat, humidity, dust, odors, fumes, and pulmonary irritants; (viii) can understand, remember and apply information; (ix) can concentrate, persist, and maintain pace to perform simple routine and repetitive tasks, but not at a production-rate or assembly-line pace; (x) is limited to simple work-related decisions, using her judgment, and dealing with changes in the work setting; and (xi) is able to frequently interact with supervisors, coworkers, and the public. (Tr. 141-42). The VE opined such a person could not perform Ms. Nelson's previous jobs but could perform the three previously cited jobs. (Tr. 142). The VE also opined that all competitive employed would be precluded if the hypothetical individual could only occasionally

reach in all directions with the upper-right extremity. (Tr. 143). The VE further opined that the hypothetical individual would also be precluded from competitive employment if the individual needed to elevate a lower extremity to a 90-degree angle for 20 minutes about three to four times a day. (*Id.*).

The ALJ changed the hypothetical individual to add that the individual could never operate left foot controls and asked if that individual could perform the jobs the VE cited. (*Id.*). The VE concluded that change did not affect the jobs that individual could perform. (*Id.*).

The ALJ further changed the hypothetical individual to add that the individual would be off task for 20 percent of an 8-hour workday and/or be absent from work 2 days per month. (*Id.*). The VE opined there would be no jobs for that individual. (*Id.*). The VE explained, based on her education, experience, and knowledge, that either being off task more than 10 percent of a workday or being consistently absent 1 to 2 days per month are preclusive to competitive employment. (Tr. 142).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1.    Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) and 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## THE ALJ'S DECISION

At Step One, the ALJ determined Ms. Nelson had not engaged in substantial gainful activity since the alleged disability-onset date of June 17, 2021. (Tr. 82). Although Ms. Nelson earned income in 2018, it did not qualify as "substantial gainful activity." (*Id.*).

At Step Two, the ALJ identified Ms. Nelson faced the following severe impairments: (i) degenerative disc disease and spondylosis with radiculopathy of the lumbar spine, (ii) moderate canal stenosis of the cervical spine, (iii) status-post right shoulder arthroscopic rotator cuff repair, (iv) status-post arthroscopically assisted debridement and osteotomy of the left ankle,

(v) fibromyalgia, (vi) asthma/COPD, (vii) obesity, (viii) depression, and (ix) moderate dementia. (*Id.*).

At Step Three, the ALJ found Ms. Nelson did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment. (Tr. 84). Specifically, the ALJ considered Listings 1.15, 1.16, and 1.18 (musculoskeletal disorders) and Listings 3.02 and 3.04 (COPD and asthma). (*Id.*). The ALJ concluded Ms. Nelson did not meet the requirements of Listings 1.15, 1.16, and 1.18 because she does not routinely use a mobility-assistive device. (*Id.*; *see also* Listings 1.15(D)(1), 1.16(D)(1), and 1.18(D)(1).). As to Listings 3.02 and 3.04, the ALJ concluded there was no evidence in the administrative record of the required testing or hospitalizations. (Tr. 84).

The ALJ also considered Social Security Ruling (SSR) 12-2p (guiding the evaluation of fibromyalgia) and, in keeping with that ruling, considered whether Ms. Nelson's fibromyalgia, either alone or in combination with other impairments, medically equated Listings 1.15, 1.16, 1.18, 14.02 (lupus), and 14.09 (inflammatory arthritis). (*Id.*; *see also* SSR 12-2p, 2012 WL 3104869 (Soc. Sec. Admin. July 25, 2012).). The ALJ noted that the requirements of Listings 1.15, 1.16, and 1.18 were again not met because of the lack of a mobility-assistive device and concluded there was not evidence of the required symptoms for Listings 14.02 or the required inflammation, spondylitis, or inflammatory arthritis for Listing 14.09. (Tr. 84; *see also* Listing 14.02(A)(2) and 14.09(B)-(D).). The ALJ also considered SSR 19-2p (guiding the evaluation of obesity) and concluded that Ms. Nelson's obesity, either alone or in combination with other impairments, did not medically equal a listing because there was no expert testimony to that issue. (Tr. 85; *see also* SSR 19-2p, 2019 WL 2374244 (Soc. Sec. Admin. May 20, 2019).).

14

The ALJ determined Ms. Nelson's mental impairments did not meet the requirements for Listings 12.02 (neurocognitive disorders) and 12.04 (depression) because she did not meet the functional criteria laid out in each listing's paragraph B. Those listings share a set of criteria that evaluate the mental functioning of a claimant. *See* Listing 12.02(B), 12.04(B); *see also* Listing 12.00(E)-(F) (explaining "Paragraph B criteria"). To satisfy the Paragraph B criteria, a claimant must have one "extreme" limitation or two "marked" limitations over four broad areas of functioning.[5] The ALJ determined Ms. Nelson had moderate limitations in each of the four areas of functioning. (Tr. 84-86).

At Step Four, the ALJ determined Ms. Nelson's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that [Ms. Nelson] has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a), except that [Ms. Nelson] can occasionally operate left foot controls and frequently operate right hand controls. She can occasionally reach overhead with the right and the left, frequently reach in all other directions with the right and the left, frequently handle with the right and the left, and frequently finger with the right and the left. [Ms. Nelson] can occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; and occasionally balance, stoop, kneel, crouch, and crawl. She can never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle; and can frequently be exposed to humidity and wetness, dust, odors, fumes, and pulmonary irritants, extreme cold, and extreme heat. [Ms. Nelson] has the ability to understand, he claimant can occasionally operate left foot controls and frequently operate right hand controls. She can occasionally reach overhead with the right and the left, frequently reach in all other directions with the right and the left, frequently handle with the right and the left, and frequently finger with the right and the left. [Ms. Nelson] can occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; and occasionally balance, stoop, kneel, crouch, and crawl. She can never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle; and can frequently be exposed to humidity and wetness, dust, odors, fumes, and pulmonary irritants, extreme cold, and extreme heat. [Ms. Nelson] has

---

[5] An "extreme limitation" is the inability to function independently, appropriately, or effectively, and on a sustained basis. Listing 12.00(F)(2)(e). A "marked limitation" is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis. Listing 12.00(F)(2)(d).

the ability to understand, remember, apply information, concentrate, persist, and maintain pace to perform simple, routine, and repetitive tasks, but not at a production rate pace (*i.e.*, assembly line work). She is limited to simple work-related decisions in using her judgment and dealing with changes in the work setting, and is able to frequently interact with supervisors, coworkers, and the public.

(Tr. 86-87). The ALJ then concluded Ms. Nelson could not perform any past relevant work as actually or generally performed when limited to the sedentary exertion level. (Tr. 95). The ALJ found the Dictionary of Occupational Titles (DOT) describes Ms. Nelson's prior job as a Nurse's Assistant (DOT code 355.674-014), which is generally performed at the medium exertional level, but she actually performed it at the light exertional level. (*Id.*).

At Step Five, the ALJ determined jobs exist in significant numbers in the national economy that Ms. Nelson can perform given her age, education, work experience, and RFC. (Tr. 96). The ALJ cited as examples a sorter, inspector, and assembler. (*Id.*). The ALJ therefore concluded Ms. Nelson was not disabled. (Tr. 97).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters,* 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.,* 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole.

16

Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000,

2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

DISCUSSION

Ms. Nelson argues the ALJ's decision should be reversed because (1) the ALJ did not properly analyze the persuasiveness of the medical-opinion evidence using the regulatory factors and the analysis the ALJ provided was not supported by substantial evidence, and (2) the ALJ did not properly evaluate Ms. Nelson's subjective statements about her symptoms under SSR 16-3p. (ECF #9 at PageID 2074). The Commissioner responds that the ALJ applied the correct legal standards in evaluating the medical-opinion evidence and Ms. Nelson's subjective statements and substantial evidence supported those analyses. (ECF #10 at PageID 2099, 2103).

I. **The ALJ properly analyzed the persuasiveness of the medical-opinion evidence by addressing those opinions' consistency and supportability.**

First, Ms. Nelson argues the ALJ erred in assessing the medical-opinion evidence. (ECF #9 at PageID 2074). Specifically, Ms. Nelson argues the ALJ did not adequately explain, using the applicable regulatory factors, why he found the opinions of Dr. Roth and Dr. Marcus to be unpersuasive. (*Id.* at PageID 2078). The Commissioner argues the ALJ correctly evaluated the two medical opinions for consistency and supportability. (ECF #13 at PageID 2101-02).

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. §§ 404.1520(e) and 416.920(e). Because Ms. Nelson filed her social security claims filed after March 27, 2017, the ALJ will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." *Id.* §§ 404.1520c(a) and 416.920c(a); *see also Revisions to Rules Regarding the Evaluation of Medical*

*Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017). Rather, an ALJ must explain how persuasive the ALJ finds those opinions to be. *See* 20 C.F.R. §§ 404.1520c(b) and 416.920c(b); *see also Reeves v. Comm'r of Soc. Sec.*, 618 F.App'x 267, 275 (6th Cir. 2015).

The ALJ determines the persuasiveness of a medical source's opinion following a five-factor analysis: (1) supportability; (2) consistency; (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors that tend to support or contradict a medical opinion. 20 C.F.R. §§ 404.1520c(c)(1)-(5) and 416.920c(c)(1)-(5). Supportability and consistency are the most important factors the ALJ must consider. *Id.* §§ 404.1520c(b)(2) and 416.920c(b)(2); *see also Palmore v. Comm'r of Soc. Sec.*, No. 1:20-CV-36, 2021 WL 1169099, at *4 (S.D. Ohio Mar. 29, 2021). As such, the ALJ must "*explain* how [the ALJ] considered the supportability and consistency factors for a medical source's medical opinions" in the written decision. *See* 20 C.F.R. §§ 404.1520c(b)(2) and 416.920c(b)(2) (emphasis added).

### A.     Dr. Roth's opinion

Initially, Ms. Nelson contends the ALJ erred when he found the opinion of Dr. Roth, one of Ms. Nelson's treating physicians, to be unpersuasive. (ECF #9 at PageID 2075). The ALJ wrote:

> In an opinion form dated in October 2020, Mark Roth, M.D., opined that [Ms. Nelson] could perform a reduced range of sedentary exertional work, noting also that [Ms. Nelson] would need to change positions, lie down at unpredictable times, and would be absent from work more than four times per month. This is somewhat supported with reference to [Ms. Nelson]'s lumbar back disorder as well as symptoms such as back and ankle pain. Dr. Roth's treatment notes also document [Ms. Nelson]'s subjective symptom reports; however, there is also evidence that [Ms. Nelson] exhibited largely unremarkable findings during these visits without indication that such restrictions were reported or advised. Likewise, this assessment is not entirely consistent with the longitudinal record. As previously noted, [Ms. Nelson] subsequently underwent operations on both her shoulder and her ankle; however, she was also observed with normal gait, and she reported considerable improvement following her shoulder operation. This is little more than a checkbox

form without much in the way of narrative support for the assessed limitations,
which are overly restrictive in comparison with the medical evidence of record.
Thus, this assessment is not persuasive.

(Tr. 91).

The ALJ's decision demonstrates he properly analyzed the persuasiveness of Dr. Roth's

opinion using the factors in 20 C.F.R. §§ 404.1520c(c) and 416.920c(c). First, the ALJ analyzed

the opinion's supportability, which the regulations define to mean "the more relevant the objective

medical evidence . . . presented by a medical source are to support his or her medical

opinion . . . the more persuasive the medical opinion . . . will be." *Id.* §§ 404.1520c(c)(1) and

416.920c(c)(1). The ALJ wrote the opinion "is somewhat supported with reference to [Ms.

Nelson]'s lumbar back disorder as well as symptoms such as back and ankle pain" and Dr. Roth's

own treatment notes. (Tr. 91). Though the ALJ does not mention it, his opinion does cite an

abnormal MRI scan of Ms. Nelson's left ankle and an MRI of her lumbar spine. (Tr. 1458). The

ALJ recognized Dr. Roth's citations in his opinion and his treatment notes support his opinion.

However, the ALJ also criticizes the form of the opinion as "a checkbox form without

much in the way of narrative support for the assessed limitations." (Tr. 91). While the ALJ does

not phrase this analysis expressly in the language of the supportability factor, the regulations

further define that factor to include "the more relevant  . . . *supporting explanations* presented by a

medical source are to support his or her medical opinion . . . the more persuasive the medical

opinion . . . will be." 20 C.F.R. §§ 404.1527(c)(1) and 416.920(c)(1) (emphasis added). Courts

have characterized medical opinions as "weak evidence at best" where that opinion is conclusory;

provides little or no supporting findings or records; or consists largely of one-word answers, circles,

or checkmarks. *See Ellars v. Comm'r of Soc. Sec.*, 647 F.App'x 563, 566-67 (6th Cir. 2016) (ALJ

properly discounted the persuasiveness of a treating physician's opinion where it simply noted

plaintiff's impairments consisted of severe peripheral vascular disease, coronary artery disease, COPD, depression and anxiety); *Kepke v. Comm'r of Soc. Sec.*, 636 F.App'x 625, 630 (6th Cir. 2016) (same where a treating physician's questionnaire failed to provide any explanation for his responses); *Herzog v. Comm'r of Soc. Sec.*, No. 2:16-CV-244, 2017 WL 4296310, at *3 (S.D. Ohio Sept. 28, 2017) (noting that while "there is no per se rule regarding this type of evidence, the Sixth Circuit has cast doubt on the usefulness of check-box forms where the physician fails to give any explanation for his or her findings."). Dr. Roth's opinion consists of single-line descriptions, the longest of which is nine words, and check-marked restrictions. (*See* Tr. 1458). Dr. Roth mentions an "abnormal MRI of [Ms. Nelson's left] ankle and MRI [of Ms. Nelson's] lumbar spine" as his medical findings, but he does not explain how those findings lead to his check-marked conclusions about her limitations. Thus, the ALJ was entitled to discount the supportability of Dr. Roth's opinion because of the limited explanations. *See Duke v. Comm'r of Soc. Sec.*, No. 21-CV-39, 2022 WL 1075171, at *3 (N.D. Ohio Apr. 11, 2022) (medical opinion is patently deficient where it noted treatment consisted of "medications" and listed symptoms but provided no explanation of treatment, symptoms, or how the symptoms led to the opined limitations).

Next, the ALJ analyzed the opinion's consistency, which the regulations define to mean "[t]he more consistent a medical opinion . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion . . . will be." 20 C.F.R. §§ 404.1520c(c)(2) and 416.920c(c)(2). Here, the ALJ points out while Dr. Roth's treatment notes document Ms. Nelson's subjective symptom reports, they also contain "largely unremarkable findings during these visits" and do not indicate the assessed restrictions were reported or advised to her. (Tr. 91). *See Mason v. Comm'r of Soc. Sec.*, No. 3:20-CV-02013-JGC, 2021 WL 7286812, at *8

(N.D. Ohio Dec. 15, 2021) (ALJ properly discounted physician's opinion where it was internally inconsistent with the physician's treatment notes), *report and recommendation adopted*, 2022 WL 592944 (N.D. Ohio Feb. 28, 2022).

The ALJ also compared the opinion to other medical evidence in the record, writing: "[Ms. Nelson] subsequently underwent operations on both her shoulder and her ankle; however, she was also observed with normal gait, and she reported considerable improvement following her shoulder operation." (*Id.*). This other evidence and Dr. Roth's unremarkable examinations contrasts with the extensive physical limitations on walking and lifting Dr. Roth imposed, supplying substantial evidence for the ALJ's conclusion that Dr. Roth's opinion is inconsistent with the other evidence.

Thus, the ALJ did not err in finding Dr. Roth's opinion unpersuasive. The ALJ applied the supportability and consistency factors when analyzing the opinion. Substantial evidence supported the ALJ's determination that Dr. Roth's opinion was supported by the evidence he cited, but the other evidence in the administrative record did not support limitations as extensive as those Dr. Roth found and the opinion's limited explanations did not resolve these inconsistencies. To the extent Ms. Nelson argues the ALJ should have found Dr. Roth's opinion more supported by Ms. Nelson's complaints to other physicians or more consistent with Dr. Kousa's opinion or other evidence in the record. (ECF #9 at PageID 2077-78), this Court cannot reweigh the evidence and come to a different result where substantial evidence supports the ALJ's determination. *See Jones*, 336 F.3d at 477.

### B.      Dr. Marcus's opinion

Next, Ms. Nelson contends the ALJ erred when he did not entirely adopt the opinion of Dr. Marcus, her orthopedic surgeon. (ECF #9 at PageID 2075). Of note, the ALJ generally

accepted Dr. Marcus's opinion, but with greater limitations to account for impairments Dr. Marcus did not consider. The ALJ wrote:

> Shortly thereafter, in November 2020, Randall Marcus, M.D., opined that [Ms. Nelson] could stand and walk for three hours; has no limitations for sitting; could lift/carry 10 pounds occasionally and less than 10 pounds frequently; would need to shift between standing and/or walking and sitting; and would not need to lie down. This was generally supported with reference to [Ms. Nelson]'s left ankle osteochondritis with pain as well as the multiple recommendations for surgery. While there is little evidence to support the assessed limitation regarding shifting positions, Dr. Marcus' treatment notes also generally support this assessment, including symptom reports from [Ms. Nelson], medical imaging of her ankle, and the history of these issues. The opinion is generally consistent with the longitudinal record, including multiple recommendations for ankle surgery coupled with evidence that [Ms. Nelson] subsequently underwent the operation in early July 2022. Otherwise, records reflect that, prior to the ankle operation, she was observed with normal gait and otherwise unremarkable findings. Thus, while additional limitations are required to account for other severe impairments not considered by Dr. Marcus, this assessment is considered generally persuasive.

(Tr. 91-92). Ms. Nelson argues the ALJ's analysis was deficient (ECF #9 at PageID 2075-76), but it is not entirely clear whether Ms. Nelson contends the ALJ should have rejected Dr. Marcus's opinion or should not have included additional limitations. It would be logically impossible for the ALJ to adopt both Dr. Roth's and Dr. Marcus's opinions as the two physicians disagree on whether Ms. Nelson can work. (*Contrast* Tr. 1458 *with* Tr. 1459).

In the absence of a focused challenge, this Court will not seek out on its own what it thinks is the most persuasive challenge to the ALJ's analysis. *See Gray v. Astrue*, No. 4:09-CV-01468, 2010 WL 2106200, at *4 (N.D. Ohio Mar. 31, 2010) ("It is not the Court's function to comb through the entire record to develop an argument on Gray's behalf or to take the portions of the record cited by Gray's counsel and attempt to craft an argument that supports the general issues he referenced in the most perfunctory manner."), *report and recommendation adopted*, 2010 WL 2106196 (N.D. Ohio May 25, 2010); *Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491

(6th Cir. 2006); *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones.").

Nevertheless, the ALJ properly analyzed the persuasiveness of Dr. Marcus's opinion using the supportability and consistency factors in 20 C.F.R. §§ 404.1520c(c) and 416.920c(c). The ALJ noted that Dr. Marcus's opinion that Ms. Nelson could return to work with limitations on standing, walking, and lifting more than 10 pounds was supported by his reference to the left ankle osteochondritis for which he was treating her. (Tr. 91-92). The ALJ also noted that Dr. Marcus's opinion was consistent with his treatment notes, medical imaging, and the other physicians' recommendations for Ms. Nelson's ankle pain in the administrative record. (Tr. 92). The ALJ does not mention that Dr. Marcus's opinion followed the same form as Dr. Roth's opinion, which he criticized as "little more than a checkbox form." (*Compare* Tr. 1459 *with* Tr. 1458). However, the ALJ was seemingly less concerned with Dr. Marcus's terse explanations here as the opinion was consistent with other evidence in the record.

Ultimately, the ALJ properly analyzed the opinions of Dr. Roth and Dr. Marcus. For both opinions, the ALJ applied the supportability and consistency factors and supported his conclusions for each factor with substantial evidence. Consequently, I recommend the District Court decline to remand on this basis.

## II.    The ALJ properly analyzed Ms. Nelson's subjective statements of her symptoms.

Second, Ms. Nelson argues the ALJ's analysis of her subjective statements about her symptoms did not comport with SSR 16-3p. (ECF #9 at PageID 2079). Specifically, Ms. Nelson contends the ALJ did not clearly articulate how he applied the required regulatory factors nor did

he provide specific reasons for his findings. (*Id.* at PageID 2082). The Commissioner responds the ALJ correctly applied SSR 16-3p and identified substantial evidence in support of the RFC. (ECF #10 at PageID 2105-06).

The regulations direct the ALJ to evaluate a claimant's subjective complaints of symptoms based on the evidence in the longitudinal record, guided by several regulatory factors. *See* SSR 16-3p, 2017 WL 5180304, at *7-8 (Soc. Sec. Admin. Oct. 25, 2017); 20 C.F.R. §§ 404.1520(e) and 416.920(e). A claimant's subjective complaints may support a finding of disability only where objective medical evidence confirms the severity of the alleged symptoms. *Workman v. Comm'r of Soc. Sec.*, 105 F.App'x 794, 800-01 (6th Cir. 2004).

Generally, "[i]t is for the [ALJ], not the reviewing court, to judge the consistency of a claimant's statements against the record evidence." *Lipanye v. Comm'r of Soc. Sec.*, 802 F.App'x 165, 171 (6th Cir. 2020). The ALJ must assess the consistency of a claimant's statements concerning the intensity, persistence, and limiting effects of symptoms of an alleged disability. SSR 16-3p, 2017 WL 5180304, at *8-9. In making that assessment, the ALJ must consider a variety of factors, including a claimant's daily activities; the location, duration, frequency, and intensity of symptoms; and the scope and effectiveness of any medications or treatments. *See* 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3). Among other requirements, the ALJ's evaluation of a claimant's symptoms must find support in the record. *See* SSR 16-3p, 2017 WL 5180304, at *10.

The ALJ's decision as a whole analyzes Ms. Nelson's subjective complaints using multiple factors, though the decision does not expressly name these factors and the discussion of them was interspersed with its discussions of other evidence. An ALJ's decision must be read as a whole and with common sense. *Buckhanon ex rel. J.H. v. Astrue*, 368 F.App'x 674, 679 (7th Cir. 2010); *Evans v.*

*Comm'r of Soc. Sec.*, No. 1:19-cv-2895, 2020 WL 6064112, at *13 (N.D. Ohio Oct. 14, 2020) ("While the ALJ must discuss significant evidence supporting his decision and explain his conclusions with sufficient detail to permit meaningful review, there is no requirement that the ALJ incorporate all the information upon which he relied into a single tidy paragraph."); *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004) ("Because it is proper to read the ALJ's decision as a whole . . . it would be a needless formality to have the ALJ repeat substantially similar factual analyses" in different parts of the decision.).

In multiple places, the ALJ discussed the impact of Ms. Nelson's conditions on her daily activities as instructed by §§ 404.1529(c)(3)(i) and 416.929(c)(3)(i). At the start of the analysis, the ALJ noted:

> [Ms. Nelson] reported difficulty with activities such as lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, hearing, stair climbing, completing tasks, and using her hands. At the hearing, she testified to the following: her back pain has worsened to the point that she cannot sit or stand for more than one minute at a time, and cannot walk more than a few steps. There is nerve pain in her neck as well as pain with reaching, and although her shoulder surgery helped some, she sometimes experiences numbness in her fingers as well. Before her left ankle surgery, she had extreme pain with four to five falls per week, and would need to elevate her ankle due to swelling. She uses a breathing machine and inhaler four times per day. She lives with her son as well as a friend who takes care of her, and needs some reminders to take her medications.

(Tr. 87). In discussing her COPD, the ALJ wrote, "[a]t the hearing, [Ms. Nelson] testified that she uses her inhaler four times per day in addition to a breathing machine." (Tr. 88). In discussing her back pain, the ALJ noted, "[b]ecause of her pain, [Ms. Nelson] reported that she takes longer to perform her activities of daily living and personal care tasks." (Tr. 89). In Step 3 of the analysis, the ALJ noted Ms. Nelson's depression and memory pose "issues with respect to completing tasks." (Tr. 86).

Similarly, the ALJ discussed Ms. Nelson's reported symptoms throughout the decision, a factor to be considered under §§ 404.1529(c)(3)(ii) and 416.929(c)(3)(ii). While discussing Ms. Nelson's COPD, the ALJ wrote:

> Symptom reports include shortness of breath with rest or exertion, cough, and chest congestion . . . [Ms. Nelson] reported wheezing and other symptoms, noting that she was unable to lay down due to her shortness of breath, and that her medications were not helping . . . Thereafter, [Ms. Nelson] reported to the emergency department with similar symptoms, but apart from some expiratory wheezing, observations were largely unremarkable.

(Tr. 88). The ALJ added, "the record does not reflect evidence of other asthma/COPD flares, and records from October 2021 confirm that her symptoms were stable." (*Id.*). In discussing her pain, the ALJ noted, "[Ms. Nelson] reported symptoms of neck, shoulder, back and lower extremity pain during various treatment visits." (Tr. 89). While discussing her left ankle, the ALJ reported:

> Thereafter, in the summer of 2020, [Ms. Nelson] began reporting worsened left ankle pain along with instability and swelling, and was observed with diffuse swelling and palpable tenderness with no evidence of motor deficits . . . At the hearing, [Ms. Nelson] testified that she had experienced some complications since the operation, and that she was still non-weightbearing with additional symptoms of pain and numbness in her left foot.

(Tr. 89). The ALJ also noted Ms. Nelson's mental-health symptoms, writing she "has also reported mental health symptoms including depression and anxiety during the period at issue. She has exhibited depressed or anxious mood and effect during treatment visits." (Tr. 90).

Additionally, the ALJ extensively discussed both the type, dosage, and effectiveness of Ms. Nelson's medication and treatment, as instructed by §§ 404.1529(c)(3)(iv)-(v) and 416.929(c)(3)(iv)-(v), throughout the decision. While discussing her COPD, the ALJ noted Ms. Nelson "reported . . . her medications were not helping" and she "uses her inhaler four times a day in addition to a breathing machine." (Tr. 88). The ALJ also noted that in one of Ms. Nelson's hospital stays for COPD "observations were largely unremarkable" and in another that "medical

27

imaging of her chest from September 2018 displayed no active disease in the chest." (Tr. 88). While discussing her shoulder pain, the ALJ noted, "[i]n March 2021, [Ms. Nelson] underwent right shoulder arthroscopic rotator cuff repair with biologic implant augmentation and extensive glenohumeral debridement. She participated in therapy following this operation, and reported that she was doing well during her follow-up visits." (Tr. 88-89). Regarding Ms. Nelson's back pain and fibromyalgia, the ALJ noted Ms. Nelson "was prescribed oxycodone without indication that more extensive treatment modalities were considered necessary for her symptoms. The evidence does not otherwise reflect that more extensive treatment modalities were recommended, such as cervical or lumbar spine surgery." (Tr. 89). While discussing her ankle pain, the ALJ noted Ms. Nelson "was recommended for an outpatient surgery, which was not performed until approximately one year later in July 2022," after which "she had experienced some complications since the operation, and that she was still non-weightbearing with additional symptoms of pain and numbness in her left foot." (Tr. 89). In discussing her mental-health treatment, the ALJ noted, "[r]ecords reflect that she has been treated with medications for these symptoms, but the record does not reflect much more significant treatment modalities." (Tr. 90). In relation to her dementia, the ALJ noted Ms. Nelson "was referred for additional treatment and has an appointment in September 2022, and was prescribed vitamin B12 with other conservative treatment modalities." (*Id.*).

While the ALJ did not expressly mention the factors by name, the ALJ's decision shows he considered Ms. Nelson's subjective statements by applying multiple regulatory factors. The ALJ concluded, repeated at the end of multiple paragraphs, that Ms. Nelson faces limitations like what she complains of, but the limitations she complains of are not so debilitating as to preclude all

work activity. (*See* Tr. 87-90). The ALJ thoroughly evaluated the record as a whole and his subjective-symptoms determination is supported by substantial evidence given the ALJ considered the impact of her daily pain on her movements and ability to perform daily tasks; discussed the symptoms of her COPD, pain, depression, anxiety; and assessed the scope of her treatments and noted their effectiveness in controlling those symptoms. While the ALJ could have expressly invoked the regulatory factors, the ALJ is not required to do so and the decision as a whole shows the ALJ considered those factors. *See Evans*, 2020 WL 6064112, at *13.

Consequently, I recommend that the District Court decline to remand on this basis.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **AFFIRM** the Commissioner's decision denying disability insurance benefits and supplemental security income.

Dated: July 23, 2024

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

## OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge.** *See* **Fed. R. Civ. P. 72(b)(2);** *see also* **28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or**

whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).